### JESSUP & MOORE PAPER CO. v. PIPER et al.

(Circuit Court, E. D. Pennsylvania. November 13, 1902.)

#### No. 27.

1. SALE—ACTION FOR NONDELIVERY—MATTERS EXCUSING NONPERFORMANCE.

Defendants, who owned a colliery reached by a single line of railroad, contracted to deliver at the works of plaintiff, at an agreed price, a stipulated quantity of coal each month during a series of months; the contract providing, however, that they should not be liable for a failure to perform if prevented by hindrances beyond their control. During certain months they delivered less than the required quantity, as claimed, through their inability to obtain sufficient cars. *Held,* that they were excused from full performance if they were unable to obtain cars to enable them to fulfill all their contracts, and they in good faith made deliveries to all customers ratably, but that they were bound to put forth all reasonable and proper exertion, and to pay any reasonable additional expense to obtain cars, and were liable for nonperformance if they failed to do so, or if they made the shortage of cars an excuse to demand an increased price, and gave a preference to such customers as paid it, and that if, after knowledge of the shortage of cars, they made additional contracts which lessened their ability to ship to plaintiff, they would be liable to that extent.

At Law. Charge to jury.

Richard C. Dale, for plaintiff.
Rudolph M. Schick, for defendants.

J. B. McPHERSON, District Judge. Gentlemen of the Jury: There is a question of fact in this case to be submitted to you, and I shall endeavor to explain it in a few words. There is no dispute between the parties as to what the contract between them was, and there could be no dispute, because the contract is in writing.

W. H. Piper & Co., the defendants in this suit, agreed to deliver to the Jessup & Moore Paper Company a certain quantity of coal at a given price—$1.82, I think it was, a ton—delivered upon the siding near their works, somewhere in the neighborhood of Wilmington. They agreed to deliver from seventeen hundred tons a month up to— I do not think the amount was specified, but it was to be as called for, as I recall.

Mr. Dale: Up to ten thousand tons.

The Court: The maximum was ten thousand tons, but the amount to be delivered was, I think, not specified.

Mr. Schick: Was to be ten thousand tons at the buyer's option.

The Court: The amount was to be at the buyer's option, between seven thousand and ten thousand tons. At all events, the precise amount to be delivered per month is not in dispute. The contract was to run from the 1st of October until the 1st of April, and the deliveries, of course, were to be made within that period. There was no difficulty about the deliveries in the month of October, and I ought to say before I make that remark, even, that at the time the contract was made there was no reason that either party should anticipate a shortage in the supply of cars. Nothing appears in evidence to justify the defendants in anticipating that any shortage would occur. It would be entirely right for you to draw the inference, on the contrary, that both sides assumed that cars would be on hand to deliver the coal as it should be needed. In point of fact, in October there was no difficulty about it, and seventeen hundred tons were delivered to the plaintiffs at their mills. In November the supply of cars began to be somewhat difficult to obtain, although even in that month between seven and eight hundred tons were delivered. The difficulty arises here, during the last four months, December, January, February, and March; and during those months I think the jury would be justified—the parties, indeed, do not seem to be in any dispute upon that subject—in finding that there was a shortage of cars; that is to say, the railroad company did not deliver at the colliery of the defendants cars sufficient to enable them to fulfill all their contracts for delivery during those months. The question is how far that scarcity of cars operated to relieve the defendants from the obligation of this contract. As a matter of course, if the contract had been out and out to deliver so many tons per month within this specified period, the mere shortage of cars would have been no answer. If Messrs. Piper & Co. had undertaken to deliver, it would have been their lookout whether the cars were actually present or not; and, if the cars were not present, no matter if it were the fault of the railroad company that the cars were not on hand, notwithstanding that, the loss must have fallen upon Piper & Co., because of their unqualified contract to deliver.

There is a clause in this contract that they will not be responsible for the fulfillment of it if it be prevented by strikes or by hindrances beyond their control. I have not given you precisely the language, but I have given you what I have no doubt is the essential meaning of the clause. "Hindrances beyond their control" is the phrase that concerns us now. What, in the light of the evidence before us, would be a hindrance beyond the control of the defendant? It appears that this colliery is situated upon a line of the Pennsylvania Railroad, and that

road is the only means by which the coal can be moved in the first instance.   Of course, after a while it will reach a point where some other road connects, and then it may go elsewhere, but for the first movement of the coal the defendants are dependent upon the Pennsylvania Railroad.   Therefore, if the Pennsylvania Railroad should decline absolutely to furnish them any cars whatever, of course the defendants could not move a pound of coal, except so far as their own cars might suffice to carry it.   There is no allegation that the railroad company absolutely refused to deliver them any cars, but that it refused to deliver them cars in sufficient quantity to enable them to fulfill their contract.

It is at that point that we approach the question of fact that is to be submitted for your determination—that is, the allegation upon the part of the defendants that they did not have sufficient cars to enable them to fulfill their contracts, and therefore that they did the next best thing; that is to say, they apportioned their cars among all their customers, giving to each one his due and ratable share.   If the facts were as averred by the defendants, I think that would be a fair, a reasonable, and proper thing to do.   I do not think the defendants could be called upon to carry out one contract in full at the expense of all the other contracts for which they were equally bound, but that if there was a genuine scarcity of cars, so that it was impossible for them, for example, to carry out more than twenty-five per cent. of their contracts, if they carried out twenty-five per cent. of each contract I think that would be perfectly fair and proper and lawful to do, under such a contract as lies before us.

But the allegation of the plaintiff is that the facts were different, and that the scarcity of cars which prevailed to some extent was made use of by the defendants for the purpose of extorting a larger sum of money for their coal; that they went to their customers and said: "Now, you cannot get the coal we have contracted to deliver to you, unless you agree to make a new contract.   If you agree to pay so much more for the coal, we can make an arrangement by which we can carry out our contract with you, and you can get your coal, although you will have to pay a higher figure for it."   It is said that the evidence shows that such of their customers as came in to the arrangement of that sort did receive the coal which they had contracted for, and received it in full, but that persons such as the plaintiff, the Jessup & Moore Company, that declined to pay a higher price, were allowed to get it as best they might, and were simply given such coal as the defendants chose to give them.   You will have to determine what the facts are upon those questions.   Was it within the power of the defendants to carry out this contract?   If the plaintiff, the Jessup & Moore Paper Company, had paid that higher price, would the contract have been carried out? Would the defendants have been able to carry it out if this higher price had been contracted for and paid?   That is an important matter for the jury to determine, because, if the defendants were using the situation as a mere cover and pretext to extort a higher price for the coal, and if, in point of fact, it was able to carry out its contract by arrangement with the railroad company, as a matter of course such conduct could not be tolerated.   It is bound to carry out its

contracts even with that clause in, so far as—at all events—to put forth all reasonable and proper exertion to overcome whatever hindrances may be offered to the carrying out of its contracts. It is not every hindrance that would justify the defendants in stopping the execution of the contract, and saying, "I can no longer carry out this contract." If the hindrance is of that kind that it could be removed by somewhat greater exertion or labor, or the reasonable expenditure of money, the defendants were bound to put forth that additional exertion and labor, and were bound to spend that additional reasonable sum of money in order to carry out their contract.

Moreover, it has been said here—there is some evidence upon the subject—that after this scarcity of cars became manifest the defendants continued to make contracts for delivery of coal, and thereby decreased their ability to comply with their former contracts. The jury will take the evidence upon that subject, and consider how far it establishes that averment, because, if it be true that, after it became manifest to the defendants that they could not get cars enough to carry out the contracts which they then had in existence, if they then continued to make additional contracts, thereby certainly decreasing their ability to carry out the contracts they had already made, and if they attempted to supply these subsequent contracts as well as those preceding, then that certainly was not a hindrance beyond their control, but was a hindrance of their own making; and, so far as these subsequent contracts interfered with their ability to deliver to the plaintiff, then to that extent, at least, there could be no question of their responsibility.

I do not know whether I make myself clear upon that subject. At the risk of being tedious, I shall repeat what I mean on that particular branch of the case. If it became clear to the defendants that they could not get enough cars to carry out all their contracts, if they then made other contracts which obliged them to deliver other coal, and if they attempted to fulfill those subsequent contracts as well as the ones they had before, then I say clearly there can be no question upon that point. It diminished their power to carry out the contracts they already had made, and to that extent, at least, there could be no doubt about the right of the plaintiffs to recover in the present case. That might not be, and would not be, the whole extent of the plaintiffs' claim, but to that extent, at least, I think it would be quite clear that the plaintiffs are entitled to recover.

With regard to the remainder of the plaintiffs' claim, I think I need not repeat what I already have said with regard to the duty of the defendants. If you find that they could have obtained the cars for delivery to the plaintiffs by arrangement with the railroad company, they were bound to make it. They were bound, in other words, to do whatever was reasonable and proper to overcome whatever hindrance existed with regard to this car supply; and, if they failed to do whatever was reasonable and proper, whether it be the expenditure of labor and exertion, or the reasonable expenditure of money, then they have failed in the discharge of their duty, and to that extent they would be liable to respond to the plaintiff in damages. But if there was a scarcity of cars—a shortage of cars—and it was beyond their power—explaining as I have what their duty in that respect was—if it was beyond their

power to remove that hindrance, if they gave the plaintiff its ratable share of cars during the period in question, then they certainly have discharged all their duty with reference to that part of the claim that they could be called upon to discharge. It would still leave the other portion, to which I have already referred, growing out of their having made subsequent contracts at the time when the shortage was already manifest.

The measure of damages, if you find in favor of the plaintiff, is the difference between the contract price and the price which the plaintiff was obliged to pay in the open market for that quantity of coal which by the fault of the defendants was not delivered to it. That may be the whole amount of the plaintiff's claim, or it may be only a part of the plaintiff's claim. It will be for the jury to say to what extent the plaintiff is entitled to recover.

Mr. Dale: On behalf of the plaintiff I will withdraw all the points.

The Court: I think I have answered your points. I think I have answered Mr. Schick's, too.

Mr. Schick: I will withdraw them.

(Mr. Schick excepts to that part of the charge in which the court leave it to the jury to find that they may have made arrangements with the railroad company to supply the cars to the plaintiffs.)

(Exception noted for defendant.)

(Counsel for plaintiff excepts to that portion of the charge in which, in substance, it is said to the jury that the insufficiency of cars to supply all their contracts is a defense.)

The Court: Do you mean where I told the jury if they gave them the ratable quantity? Do you object to that statement?

Mr. Dale: Yes, sir.

The Court: My attention has been called to what may be a misapprehension. Mr. Schick believes I said to the jury that, if the defendant might have made or could have made an arrangement with the railroad company for the supply of cars, it would have been its duty to do so. I do not think I said so. I certainly did not intend to say so. What I intended to refer to with regard to the arrangement with the railroad company was that which seems to be referred to in a letter or two that you have heard read by the defendants in which he speaks of an arrangement with the railroad company apparently having been made with other persons to whom they were to ship coal, and as to which he inquires whether he shall make a similar arrangement with the railroad company on behalf of the plaintiff. That was the arrangement to which I referred, and not any possible arrangement or general arrangement.