## BREACH OF CONTRACT TO DELIVER COAL.

Circuit Court of Lucas County.

EMPIRE COAL MINING COMPANY v. THE GEORGE M. JONES COMPANY.

Decided, September 28, 1907.

*Contracts—Agreement to Deliver Coal at the Rate of Five Cars per Day —Suit by Seller for Payment—Counter-Claims by Purchaser Based on Failures to Deliver—Procedure where Plaintiff Rests Upon Insufficient Evidence—Proof of Loss Under a Breach of Contract— Plaintiff Need Not Allege Readiness and Ability to Perform, When —Meaning of the Phrase "Mining Rate."*

1. Where at the close of the evidence in support of a claim upon which judgment is asked a motion to withdraw the case from the jury is overruled, the right to prosecute error thereto is waived and lost, if the defendant does not stand upon his motion, but instead of so doing proceeds with the testimony for the defense.

2. Upon renewal of such a motion at the close of all the evidence, any deficiency in the evidence for the plaintiff which has been corrected by that offered for the defendant enures to the benefit of the plaintiff.

3. It is not necessary that a dealer in coal who has been called to testify as to the price of coal during a specified period should first qualify as an expert.

4. In proving loss from breach of contract to deliver coal, testimony to the effect that during the period in question prices were irregular and high, ranging between certain figures which were given, affords a fair and safe basis for computation by the jury as to the loss sustained by reason of the breach, where the jury are also apprised as to the sales made by the plaintiff during the period under review and the prices which he received.

5. Where, in such a case, the jury were cautioned that they must do no guessing or speculating, a further instruction that they were to use their best ability and understanding in the light of all the evidence, is not erroneous.

6. In an action for breach of contract to deliver goods on credit it is not necessary that the plaintiff allege or prove that he was ready, willing and able to pay for the goods on delivery.

7. In the case at bar, two of the contracts being for coal bought on credit and one capable of being construed as a purchase for cash, and there being enough in the record to sustain the judgment

which was rendered without regard to the contract for coal sold for cash, the judgment will be sustained, notwithstanding failure to allege and prove ability and willingness to perform the one of the three contracts requiring payment of cash on delivery.

*Marshall & Fraser* and *Whitlock, Milroy & Mallow*, for plaintiff in error.

*Smith & Beckwith*, contra.

PARKER, J.; HAYNES, J., and WILDMAN, J., concur.

The Empire Coal Mining Company brought an action in the court of common pleas against the George M. Jones Company, to recover on an account for coal sold and delivered by the plaintiff to defendant under three certain contracts, its whole claim, including interest, at the time of the trial, amounting to $2,220.96. The defendant filed an answer in which was set forth three counter-claims, on account of the non-delivery of coal to it under such contracts. That it had received coal of the amount and value sued for, was not disputed; so that, upon submission of the case to a jury, the jury was properly instructed to find for the plaintiff in the sum of $2,220.96. And then the question was submitted to them as to the amount, if any, that was due to the defendant from the plaintiff upon defendant's counter claim The defendant's demand upon the counter-claim was $10,332 and interest. The amount allowed by the jury was $2,243.86, leaving a balance due in favor of defendant of $22.88.

The first of the three contracts is dated September 8th, 1902, and provides for the delivery of 1000 cars of coal in the month of December, 1902, beginning with the first day of the month, at the rate of five cars per day, at $1.15 per ton of 2,000 lbs., the deliveries to be made free on board cars at the mines, which were located in the southeastern part of this state. This contract contains the provision: "This price is based upon the present mining rate and is subject to change to the same extent as the mining rate may increase or decrease." And also: "It is further understood that we shall not be called upon to furnish the coal in case of shut-down of our mines through strikes or other unavoidable cause." And also: "Shipments at the full rate on this order are conditioned upon our receiving an adequate car

supply. Settlement for all coal shipped in any month shall be made in cash by the twentieth day of the next ensuing month." These are, I believe, all the provisions to which I need call especial attention.

The next contract is dated September 15th, 1902, and provides for the delivery of coal in January, 1903. This also provides for the delivery of 100 cars, at the rate of five cars per day, commencing with the first day of the month. This contract contains the same provision as to the seller being excused in case of shut-down of mines through strikes or unavoidable causes, and as to shipments being conditional upon sellers receiving an adequate car supply; as to settlements for coal shipped during the month of January being made in cash by the 20th day of the next ensuing month, and as to the prices being based upon the mining rate at the period subject to change to the same extent as the mining rate might increase or decrease. The prices agreed upon for this coal was for ¾ lump, $1.25 per ton, and for run of mine $1.15 per ton of two thousand pounds, f. o. b. at the mines.

The third contract is dated November 25, 1902. It consists of a written order from the George M. Jones Company to the Empire Coal Co., at Pittsburg, Pa., for 50 cars of Pittsburg No. 8¾ lump at $1.65, f. o. b. cars at the mines to be consigned to the Geo. M. Jones Co., at Toledo, Ohio, and to be forwarded at the rate of five cars per day, and adds: "this to confirm order by telephone of this date." This order was accepted by a letter reading:

"Pittsburgh, Pa., Nov. 25th, 1903. The G. M. Jones Co., Toledo, Ohio. Gentlemen: We are in receipt of your order No. 2500 of Nov. 24th, in confirmation of telephone conversation of the same date which calls for 50 cars ¾ lump to be shipped at the rate of 5 cars daily to your address, Toledo, Ohio. The same has been entered for our best attention, subject to car supply. Please accept our thanks. Yours truly, Louis F. Newman, Mgr. B."

This contains no stipulation as to credit and nothing on the subject of prices being modified by the mining rate at the mine; and nothing specific as to when the cars are to be delivered; so is was construed upon the trial—and we think correctly—to be an agreement to begin the delivery of the coal within a reasonable

time, and we believe it was conceded that such reasonable time had expired before a claim for damages on account of the non-delivery of cars under this contract was asserted.

Upon the trial the defendant undertook to show in support of these counter-claims—one under each contract—that the plaintiff was in a position with respect to cars and other circumstances so that it might have delivered a greater number of cars of coal to the defendant than it actually did deliver. It was asserted and shown that under this first contract the plaintiff had delivered but 18 cars of coal instead of 100; that under the second contract it had delivered 5 cars instead of 100; that under the third contract it had delivered 22 cars instead of 50. It was contended by the plaintiff that it had delivered all of the cars of coal that it could deliver, in view of the shortage of cars prevailing at this time; that the defendant had received its full share of all the cars available to the plaintiff for such use. It was conceded upon the trial that the rule as to the obligation resting upon the plaintiff under contracts of this character, under circumstances like those shown, is correctly stated in the case of *Jessup & Moore Paper Co.* v. *Piper et al,* 133 Federal Reporter, 108, a decision by Mc-Pherson, District Judge of the Eastern District of Pennsylvania. I read from the syllabus only:

"Defendants, who owned a colliery reached by a single line of railroad, contracted to deliver at the works of plaintiff, at an agreed price, a stipulated quantity of coal each month during a series of months; the contract providing, however, that they should not be liable for a failure to perform if prevented by hindrances beyond their control. During certain months they delivered less than the required quantity, as claimed, through their inability to obtain sufficient cars. *Held*: That they were excused from full performance if they were unable to obtain cars to enable them to fulfill all their contracts, and they in good faith made deliveries to all customers ratably, but that they were bound to put forth all reasonable and proper exertion, and to pay any reasonable additional expense to obtain cars, and were liable for non-performance if they failed to do so, or if they made the shortage of cars an excuse to demand an increased price, and gave a preference to such customers as paid it, and that if, after knowledge of the shortage of cars, they made additional contracts which lessened their ability to ship to plaintiff, they would be liable to that extent."

We say, it was agreed by counsel that that was the law of the case, and it was so laid down to the jury upon the trial.

Various errors are alleged by the plaintiff in error. It is said that at the close of defendant's evidence introduced in support of these counter-claims, a case had not been made out in favor of the defendant, and that a motion of the plaintiff to withdraw the case from the jury should have been sustained. This motion was overruled and the plaintiff went into its testimony upon the counter-claims. We are now asked, however, to examine this question, and if we shall find that that motion should have been sustained at that time, we are asked to reverse this judgment without regard to what may have subsequently developed or transpired upon the further trial of the case. We do not think that we are called upon or authorized to take such action. Had the plaintiff in error, at the close of defendant's testimony in support of the counter-claims, made this motion, and, upon its being overruled, rested his case upon it, allowed the judgment to go against him and then prosecuted error to this court, the question would have been fairly presented, and this court would have been called upon to determine whether the verdict was sustained by the evidence; but, where the course is taken which was pursued in this case, of going into the defense, we understand that the result is the same as where one demurs to a petition and, upon the demurrer being overruled, answers over. If the answer corrects the defect in the petition, the party can no longer stand upon his demurrer to the petition. So, in a case like this, if the further evidence introduced corrects that deficiency in the evidence introduced before the making of the motion, the party may no longer stand upon his motion. This motion was renewed at the close of all the evidence, on behalf of both parties; and that, of course, presents a question to this court for consideration upon that motion; and I may as well say at once, with respect to that, we do not find that the defendant failed in any material respects to introduce evidence tending to support the counter-claims, and, therefore, the court below was right in overruling that motion. I shall give more attention to certain specific claims respecting the deficiency of the evidence, further along in this opinion.

It is claimed on behalf of plaintiff in error that prejudicial errors intervened in the introduction of evidence. Mr. A. G. Blair, Jr., was called as a witness of defendant to establish the market price or the prevailing prices being paid for coal of the character that the defendant had purchased during the months that the coal should have been delivered. Mr. Blair testified that he was in the coal business in this city; had been engaged as a dealer in coal for about twelve or thirteen years; that for a few months prior to his appearing as a witness he had been engaged in operating a mine; that he was engaged in the business of buying and selling coal in the years 1902 and 1903; that he was familiar with coal of the character covered by these contracts. He tells where it came from, adjacent to the Ohio river, in the mines of the Harrison and Jefferson. Then he is asked:

"Are you able to state what was the market price of different grades of that coal at the mines in the month of November and December, 1902, and January, 1903? A. There are no different grades, there are different sizes.

"Q. Different sizes? A. Yes, sir.

"Q. Now will you please state to the jury what the market price at the mines of three-fourth lump coal was during the month of December beginning with the first of December and up to the 24th of December? A. The market price?

"Q. Yes, sir? (Question objected to.)"

No specific ground of objection is stated. It is suggested to us that the objection was on account of the witness having failed to show qualification to answer this question. The court then asked this question: "Q. At the mines—in Belmont county?" To this there was no response. There was no ruling upon this objection. Counsel for defendant then asked the further question:

"Q. At the mines from which this coal was taken in Belmont county? (Question objected to; objection overruled; exception.) A. The market price, or the selling price—do you mean—the market price was three to five dollars a ton. (Motion to strike out the answer. Motion denied. Exceptions.)"

There is a further examination of the witness, tending to show that he was advised of the prices prevailing at that time

and place; so that, really, the question raised by this objection at this time is—whether the witness must first answer directly that he is able to state what the price was, before he may be called upon to answer the question: "State what the price was?" The question and the answer presuppose that the witness, a dealer in coal, *knew* what the price was. If he did not know, he would not be called upon to answer, could not make the answer that he made. We do not understand that, under circumstances like these, it is necessary to go further to qualify the witness. In a sense, he is an expert—that is to say he is familiar and acquainted with the business, and yet he is testifying to a fact within his knowledge that a person not in the business may have become acquainted with and may have been entirely competent to answer. It is not necessarily a question for an expert, and we see no error in allowing this answer, no error in refusing to require that the witness should be further qualified by his answers—assuming that that was the ground of the objection.

Mr. William A. Gosline was called as a witness for the defendant, and it is said with respect to his testimony that he showed himself disqualified; that he did not pretend to know anything about the market price, but that he only guessed, and that his testimony should have been disregarded. It is urged that the testimony of these witnesses supplied the only basis that was supplied at the time the defendant rested its case for computing the difference between the contract prices and the market prices or the value of the coal; but, as I have indicated, we do not feel called upon to examine that question, but only to consider the question of whether prejudicial error intervened in the admission of certain answers objected to.

On the other question, when we look into the record and read the testimony of the witnesses produced after the plaintiff went into its defense, we find ample grounds and basis for computing the difference between the market price or the value at the mines and the contract price of the coal. Mr. Gosline, who was also a man in the coal business in 1902-3, had been in the business for a great many years, and when called upon to answer as to the prices being paid generally for coal during the period covered by these contracts, answered that he could "give a rough guess."

The question asked was: "Q. Can you state the market price the price being paid generally for that coal during that period?" And his answer is: "A. Yes, sir, I can give a rough guess. Of course during that period, there was much variation in price and it depended upon the amount you bought."

It appears from the record that the conditions prevailing at that time in the coal business were very peculiar, resulting in such irregularity and such rapid fluctuations in prices of coal that it was hard to name a price as the "market price," in the ordinary acception of that term. Further along in his testimony, this witness describes those conditions. I need not go into that in detail: they resulted from shortage of cars, lockouts, shut-downs, strikes, etc., so that there was no regularity in the price— there could not be said to be any prevailing prices, though it is clearly shown in this record that the prices were very much higher than those at which plaintiff had agreed to deliver this coal to defendant; that prices ranged between those named by Mr. Blair and by Mr. Gosline who answers further on that the prices ranged between $2.25 and $2.75 at the mine per ton and even ran as high as $3 per ton in January, and shows that he is not guessing, but well informed on the subject. Although these prices were fluctuating rapidly, the information brought out upon cross-examination of the representative of the plaintiff company, is very full and satisfactory and afforded a fair and safe basis for computation on the part of the jury, for, through the books of the company and the testimony of this witness, Newman, we are apprised of all the sales that were made during these periods by the plaintiff company and the prices received. We find no error in the admission of this evidence.

It is also urged that the court erred in its charge to the jury, in that it gave to the jury free rein to continue the "guessing" which had been done by the witnesses and to act upon its own judgment rather than upon the testimony; and it is said that the court charged the jury, in substance, that if the market price could not be ascertained from the testimony, they were to take instead thereof the value at the place of delivery, and that such value per ton was to be multiplied by the number of cars un-delivered that should have been delivered, and then by proper

deductions the loss of the defendant would be ascertained. We have read this charge through very carefully, and, taken as a whole, we think it is correct and fair. Of course, every paragraph is not and can not be expected to be a complete exposition of the law upon the subject—the whole charge must be taken together. It appears that the court did, in one place, make a mistake by saying that the value per ton was to be multiplied by the number of cars undelivered, which should have been delivered; but that was an error that was corrected in the further statement of the matter to the jury, and, even if it had gone uncorrected, it would not have been prejudicial to the plaintiff in error, but rather to the defendant in error, because it would have given to the defendant in error but one-thirtieth of the amount he would have been entitled to, since there were an average of thirty tons of coal in each car.

The statement upon the subject of the jurors using their best ability and understanding, is a part of a paragraph in which the court is undertaking to direct the jury as to how they shall arrive at a correct result in the computation, and in the paragraph occurs this language:

"Upon this phase of the case there should be no guessing, of course, nor speculation. You should determine, according to the best light you have, and your best ability and understanding, the difference in price between the contract and coal at the mine for the various days that the contract was broken. Multiply the price by the number of cars of coal that the evidence shows should have been shipped to the defendant on this occasion by the plaintiff, and which was not shipped."

In another part of the charge, however, the court says to the jury distinctly that they are to be guided by the evidence. I read from a preceding paragraph:

"It is the duty of the jury to determine these disputed facts from the evidence in the case. You can not guess at it. It will be your duty to determine from the evidence what the percentage was that the defendant lost by reason of the breach of any one of its contracts, or of all of them combined," etc.

So that the jury could not have misunderstood the direction of the court to them to use their best ability and understanding—

they were to do that in the application and consideration of the evidence. We find no error in the charge prejudicial to the plaintiff in error.

In the contract of September 15, 1902, it is said: "Shipments to be made in gondola cars only." That provision is not contained in either of the other contracts. It is urged on behalf of plaintiff in error that in arriving at the *pro rata* share of the defendant of the cars available to the plaintiff for the shipment of coal, the gondola cars only should be considered under this contract; and it is apparent that if that were so, there would be much less due on this account than would be due thereon if all the cars available to the plaintiff should be considered. It appears that there were within the control of the plaintiff for use in the shipment of coal more gondola cars than were necessary to fulfill this contract with the defendant. The other contracts that the plaintiff made with other dealers, for coal, which it was bound to respect and which were to be taken into consideration in arriving at the defendant's *pro rata* share, did not require of the plaintiff that it should furnish coal to those buyers in gondola care. We think, therefore, that under the circumstances, the plaintiff was bound to keep and use for the benefit of the defendant under these contracts the gondola cars available to it, or a sufficient number of them to fulfill its obligation to the defendant and that it was correct, therefore, to estimate the share of the defendant in these cars upon the basis of all the cars available to the plaintiff.

It is urged that there was no evidence adduced to the effect that the defendant was ready and willing to perform these contracts, and we are cited to a number of authorities in support of the proposition that, usually, under contracts of sale where the purchaser sues on account of the default of the seller, it devolves upon the purchaser to allege and show that he was ready and willing to perform. Among other decisions, we are cited to the case of *Henry Geisel, Jr., v. The A. G. Blair Co.* (unreported), decided by this court February 11, 1905, the opinion being by myself. It is urged that it devolved upon the party to show that he was *able* to perform. As was said in the course of that opinion, the averment that one is *ready,* seems to involve the

*ability* to perform, so that it is usually expressed as readiness and willingness to perform. We understand the rule of pleading—and the proofs ordinarily follow the pleadings—to be that the performance of conditions precedent must be alleged and shown, and that with respect to stipulations or conditions to be performed concurrently, a readiness and willingness to perform must be alleged and shown by the party who claims default on the part of another. But this is not true with respect to conditions subsequent. So that if the particular thing to be done by the person suing is to pay for an article to be delivered, whether he must allege and show readiness and willingness to perform, must depend upon whether the payment is to be made concurrently with the delivery of the property, or is to be made subsequently—in other words, whether the property is sold for cash or on credit. We have taken occasion to re-examine the record in the case of *Geisel* v. *Blair Co.*, and it appears from the record that the sale was a cash sale—at least it does not appear that any credit was given, and it is therefore presumed to have been a cash sale—and with respect to that, it was said in the opinion:

"So it appears very clearly from the authorities that under circumstances like these disclosed in this record it would devolve upon the buyer suing upon a breach of this contract, to show that he was ready, willing and able to pay for the goods."

In support of this, the case of *Simmons et al* v. *Green,* 35 O. S., 104, was cited and the syllabus read.

That the allegation or proof of readiness and willingness to perform is not required where a sale is upon credit, is stated in a great many authorities. We think it is the unquestioned law of the land. I cite but one case, that of *Monarch Mfg. Co.* v. *Royer Wheel Co.*, decided by the Circuit Court of Appeals of the Sixth Circuit and found in Vol. 105 Federal Reporter, at page 324.

This contract of September 8th, 1902, as I have pointed out, was for a sale of coal on credit. The contract of September 15, 1902, was also for a sale of coal on credit. The contract of November 25, 1902, for fifty carloads of coal, says nothing about ex-

tending credit, and we suppose that, under the rules, that must be regarded as a cash sale. Therefore, to support the counter-claims based upon the alleged breach by the plaintiff of this contract, it would devolve upon the defendant to show a readiness and willingness to perform by paying for the coal upon delivery. If, however, this verdict can be sustained upon the contracts of September 8th, 1902, and September 15, 1902, disregarding this contract of November 25, 1902, it ought not to be disturbed even if there were a failure to show any loss or damage under this contract of November 25, 1902. The general rules governing courts of error, where there is a failure of evidence as to one branch of a claim constituting a separate and distinct cause of action, or as to one defense among several defenses, or where there is error intervening in the charge of the court or in the introduction of evidence with respect to one claim or defense only of several involved in a case submitted to a jury—the general rule is, that if there is enough to sustain the verdict, disregarding the claim or defense in respect to which error has intervened, the judgment should be allowed to stand. Illustrations of this rule will be found in certain decisions of our Supreme Court which I shall cite. In the case of *Barbara Sites* v. *Caspar Haverstick et al*, found in 23 O. S., 626, it is said in the syllabus:

"Where the jury, by their verdict, 'find the issues joined in the cause' in favor of one of the parties, this is to be taken as a verdict finding each and all of the issues therein for such party.

"In such case, if the issues are such that a finding of either of them in favor of the successful party entitles him to the judgment rendered, the judgment will not be reversed for error in the instructions of the court relating exclusively to the other."

As I have said, we understand the same rule to apply to a failure of evidence in support of one claim, where there are other claims upon which the evidence would support a verdict, and the verdict in this case is upon three counter-claims and there is nothing in the record to indicate that any allowance was made to the defendant by the jury on account of this certain claim arising upon the contract of November 25, 1902, for the

fifty cars of coal. Now, this case was followed and approved in *Smith* v. *Gardner et al*, 57 O. S., 666, and in *National Union* v. *Rothner*, 57 O. S., 679.

In *McAllister* v. *Hartzell*, 60 O. S., 69, it is held that where two issues are presented in the pleadings for the determination of the jury, and there is a verdict finding the issues for the defendant, and such finding on either issue entitled him to a general judgment in his favor, and a judgment is rendered on the verdict, such judgment will not be reversed for error in the instructions of the court to the jury relating exclusively to one of the issues.

In *Beecher* v. *Dunlap*, 52 O. S., 64:

When distinct issues are submitted to a jury arising upon distinct defenses, and the verdict of the jury is general, the erroneous admission of evidence on one of the issues, does not of itself render the judgment entered upon the verdict erroneous.

In *Clark* v. *Clark*, 8 Circuit Decisions, 752:

Where there are several distinct issues in the case, an omission to properly direct the jury upon a certain matter, is not prejudicial error, unless such omission was in regard to a controlling issue in the case.

In *Topliff and Ely* v. *Topliff*, 4 Ohio Decisions, 312, affirmed and reported in 51 O. S., 625, it is held that:

If the court, a jury being waived, finds the issues joined with the defendant, this means all the issues, and the plaintiff can not show by parol that the court in fact was governed by one alternative.

In a case that we decided in Wood county a year or so ago, we had occasion to go into this question very fully and we examined these and a great many other authorities bearing upon the question. I have not been able to find that decision. I do not know that it has been reported, and in the hurry of examination of this case I am sure I have not found all of the decisions of our own courts—I mean the courts of this state—in support of this general proposition. I know that there is one criminal case in which the same rule was applied, although generally in constructions and practice there is more liberality in favor of the prisoner,

or strictness against the state, in a criminal proceeding, than prevails against a party in civil cases.

Upon looking over this record we find sufficient to sustain the verdict of the jury upon the counter-claims disregarding entirely the claims under the contract of November 25, 1902. We have taken the analysis of the evidence furnished by counsel for defendant in error, his computations, etc., and have made comparisons thereof with the record, and we are satisfied that his data and his deductions are substantially correct and that this verdict should stand.

There is one other matter to which I should make reference. In this case of *Geisel* v. *A. G. Blair & Co., supra,* we had under consideration a blank for a contract which was not filled out nor signed, but which it was claimed was the basis of the contract between the parties; and we were furnished by oral evidence with the date which would have enabled the court to fill out the contract—determine what the contract was—had we given credit to it. Upon looking at that blank we found in it a clause like that contained in certain of these contracts, to-wit: "the prices named in this contract are based on the present mining rate of (blank) per ton, and shall advance or decline as said mining rate may advance or decline during the life of this contract." Counsel had said nothing about this clause in the blank, the alleged basis of the agreement, and when we came to examine it and consider it, we assumed that what was meant by the "mining rate" was the market rate or price of coal at the mines, and upon that assumption we concluded that the party had no claim, under his alleged contract, for what he was contracting for was a certain amount of coal to be furnished to be paid for according to the prevailing market rate—that he had no contract for a special price except such as would be governed and controlled by the fluctuation of the market. While the case was not decided upon this ground, this was mentioned by us as something that appeared to us to be an additional reason why the case should be decided as we were deciding it. These contracts of September 8 and September 15th, 1902, contain like provisions, and we are not enlightened by any averment or proof as to what is meant by the "mining rate." It is said by counsel for plaint-

iff in error, however, that we should follow our decision in *Geisel* v. *Blair Co.* and reverse.   It is alleged by counsel for defendant in error that "the mining rate" means the rate to be paid to miners for mining the coal.   Without any further light upon the subject, we conclude that we are not authorized to assume, as we did in the other case, that the *mining rate* means the market price of coal at the mines.   We think that if there was any change in the mining rate affecting the price, so as to relieve the plaintiff to any extent from its apparent obligation under these contracts, such change should be alleged and shown by the plaintiff.   In the absence of any showing upon this subject, we conclude, as we believe we are bound to, that there was no such change in the mining rate.

We find no error in the record prejudicial to the plaintiff in error and the judgment will be affirmed.