No. 29,623.

THE AMSDEN LUMBER COMPANY, *Appellant*, v. JAMES STANTON and THOMAS WALLACE, *Appellees*.

(294 Pac. 853.)

Opinion filed January 10, 1931.

*S. C. Bloss,* of Winfield, *H. W. Hart, Glenn Porter, Enos E. Hook, Edward H. Jamison* and *Getto McDonald,* all of Wichita, for the appellant.

*Albert Faulconer, Kirke W. Dale* and *C. L. Swarts,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

SMITH, J.: The action was for damages for breach of a contract to purchase cement. A demurrer to the petition was sustained. Plaintiff appealed.

The appellees, James Stanton and Thomas Wallace, were contractors and had the contract to build a certain concrete road in Oklahoma. It was estimated that 15,000 barrels of cement would be required to complete this job. The appellees entered into a contract with the Amsden Lumber Company whereby they agreed to buy, and the appellants agreed to sell, 15,000 barrels of cement at a price of $2.74 per barrel, in cloth bags. The petition alleged that by virtue of the contract with the appellees the appellant entered into a contract with the Atlas Portland Cement Company of Kansas City, Mo., which bound it to buy from that company 20,000 barrels, which were to be used by appellees in the construction of the road. It al-

leged that the cement company shipped, pursuant to this contract, 800 barrels of cement, which were received by appellees, and that when that much cement had been received by the contractor they breached the contract and refused to receive any more from appellants, leaving 14,200 barrels undelivered, the profit upon which would have been ten cents a barrel, or a total of $1,420, for which amount judgment was asked. Appellees demurred to the petition. They argued that they were not bound by the contract with appellants because under its terms there was lack of mutuality in it and that the lumber company and the cement company were not bound to furnish them any cement at all; hence they were not bound to buy any. The trial court adopted the view of the appellee and sustained the demurrer; hence this appeal.

The outcome of the case turns upon the proper interpretation of the following language in the contract:

"Purchaser represents that he has a contract for the work described in this agreement, and that the cement is purchased for use by him in carrying out that work. If said representation is untrue or if any of the cement is used for any other purpose, or by any other party, seller may terminate this contract.

"The seller has a contract with the shipper for the cement to be furnished and delivered hereunder, and the purchaser agrees to give the seller shipping instructions in writing within a reasonable time before shipments are to be made, and that the seller shall not be responsible for delays in manufacturing, shipping or delivering cement, caused by strikes, fires, breakdowns, failures of machinery, embargoes, car shortage, labor scarcity, labor agitation, failure to receive coal from mines from which the shipper secures its supplies of coal, failure of shippers to receive other materials, delays in transportation, acts or regulations of any governmental agencies, acts of God, or other causes beyond the control of seller or shipper. In any of such events the shipper has the right under its contract to determine as nearly as practicable the *pro rata* share of cement of each of its customers after reserving the shipper's usual percentage of its shipments for its dealers' warehouse trade, and may limit and reduce its shipments to the seller under this contract according to the seller's *pro rata* share. The shipper also has the right under said contract to sell or agree to sell, from time to time, its cement under other agreements and orders, and in the event the shipper shall at any time for any cause whatsoever be unable to make and ship cement in accordance with its agreements and orders, the shipper may determine, as nearly as practicable, the *pro rata* share of the cement of each of its customers under its agreements and orders, after reserving the shipper's usual percentage of its shipments for its dealers' warehouse trade, and may limit and reduce its shipments to the seller under said contract according to the seller's *pro rata* share. The seller is obligated to make shipments and deliveries hereunder only as received by him under said contract

with the shipper and shall not be obligated to make up any such limitation or reduction by the shipper, and the shipper's determination as to the necessity for prorating and the *pro rata* share of the seller shall be final."

Appellee urges that the latter part of the above paragraph in the contract renders it unilateral and void.

This case is one where one promise is entered into as consideration for another promise; that is, each promise is a consideration for the other, and the contract is an ordinary contract to sell under the uniform sales act and the common law. (1 Williston on Contracts, sec. 1, *et seq.*) The appellees argue that appellant is not bound by its promise in any manner whatsoever, and that since that is the case appellees are not bound because there is no consideration for their promise. The proposition upon which appellees base their claim that the promise of appellant is not binding upon it is that under the contract the cement company and the shipper had an absolute right to decline to ship any cement whatever to appellees.

In their brief appellees cite the following language in *Edgar v. Hewett Grain & Provision Co.*, 230 Mich. 168, 202 N. W. 972:

"The correctness of defendant's contenion is to be tested by considering whether this excusing clause in the contract makes the party who takes advantage of it the sole judge as to the sufficiency of the extraneous causes relied on to excuse performance, or whether the question of the sufficiency of the causes is for a court or jury to determine. In the one case there is no obligation on the party to perform. Whether he shall perform is left entirely to his will. Whether his reasons are reasonable or not does not matter. His will alone controls. The other party has no voice in the matter and is without power to prevent his action. Such a contract cannot be sustained. It is without consideration, is lacking in mutuality, and cannot be enforced by either party. If, however, both parties have a voice in determining the sufficiency of the causes for refusal to perform, if the right to refuse performance rests on some other reason than the will of the party, if the causes specified are not confined in the mind of the one party, but are open to the observation of the other so that a court or jury may determine them, the contract is not lacking in mutuality but is binding and enforceable." (p. 171.)

With the above language we have no quarrel. We think it correctly states the rule. In the case in question the language to which appellees take exception is "in the event the shipper shall at any time and for any cause whatsoever be unable to make and ship cement in accordance with its agreements."

The outcome of this case depends on whether the above language gives the cement company the right to determine for itself whether it

is unable to ship the full amount of cement due under the contract or whether that is a question that may be submitted to a court. This question will be answered when we determine the meaning to be given the above words from the contract.

In the case cited above the language is:

"All contracts subject to strikes, fire, transportation, and business conditions and other extraneous causes which render performance commercially impracticable." (p. 170.)

The court in that case held that both parties were mutually obligated to act reasonably and that neither party had an absolute right to breach the contract unless they acted in a reasonable manner.

In defining the clause "any cause whatever" (1 Words and Phrases, p. 418) it is said:

"As used in a contract for shipment of live stock between the shipper and common carrier, providing that the carrier should not be liable for loss caused by 'escapes from any cause whatever,' cannot be construed literally, so as to exempt the carrier from all liability whatever, but only for such escapes in which the negligence of the carrier is not an active and coöperative cause. (*Oxley v. St. Louis, K. C. & N. Ry. Co.,* 65 Mo. 629, 631.)"

In the case of *Dail-Overland Co. v. Willys-Overland,* 263 Fed. 171, the court was called upon to construe the meaning of a provision in a sales contract which provided that "if by any cause" the seller was unable to complete all its contracts it might prorate the available supply of machines among its customers. This provision was attacked on the ground that the words "by any cause" were too indefinite to be ascertainable in determining for what reason the seller might deem it necessary to prorate among its various customers. The court in construing such provisions said:

"The contract says that, if 'by any cause' the Willys-Overland is unable to complete all its contracts, it may prorate among its various customers, including complainant. It cannot be that any conceivable cause would justify a default.

"We feel that the construction to be given to the term 'by any cause' is that the cause must be one reasonably beyond the power of the Overland to prevent." (p. 181.)

In the case of *Slater v. Savannah Sugar Refining Corp.,* 28 Ga. App. 280, 110 S. E. 759, the contract provided:

"Sellers will not be responsible under this contract if shipment is prevented or delayed by war conditions, strikes, labor difficulties, accidents, embargoes, regulations or restrictions imposed by any government or governmental agencies, fire or other causes beyond the seller's control." (p. 281.)

The court held that this was a valid contract and that the seller's obligation to sell was not nullified or destroyed by the clause above quoted. It said: "These are all contingencies beyond the control of the seller." The buyer in that case argued that the clause, "The supply of raw material of the refinery manufacturing the sugar described in this agreement . . .. to be interrupted by any causes" relieved the seller of responsibility and nullified the seller's obligation to sell, in that it would be possible for the seller to select a refinery which he knew would be unable to operate. However, the court said: "This provision must be given a reasonable construction, and will not be construed as intending to permit the seller to perform a palpably dishonest act and perpetrate a fraud upon the purchaser by selecting a refinery crippled and incapacitated in the manner described." (p. 284.)

The reasoning of the court in the above case applies with great force to the situation in the case at bar. It is argued by appellee that the cement company under the contract is not bound to furnish any cement at all, since it has a right to determine when the necessity for proration exists. However, the cement company would be obligated under this contract to act in a reasonable manner and would be precluded from a mere arbitrary decision to prorate its cement among various customers, and this decision would have to be motivated by some cause beyond its control, before it would have a right to exercise that option.

In the case of *Bernstein v. W. B. Manufacturing Co.*, 235 Mass. 425, 126 N. E. 796, the language of the contract was:

"All orders accepted to be delivered to the best of our ability, but will under no circumstances hold ourselves liable for failure to deliver any portion of orders taken, sometimes caused by circumstances over which we have no control."

The defendants in that case refused to accept delivery and argued that the contract was not a valid one because—

"The plaintiffs had the absolute discretion as to whether they should deliver the merchandise or not, and the defendant could not have called upon the plaintiffs for the delivery of the whole or any part of this order." (p. 427.)

The court further said:

"We interpret the word 'sometimes' in the clause to mean 'now and then,' 'occasionally,' 'if at any time.' So construed and read in its place, with the remainder of the clause, it means that performance of the agreement by the plaintiffs was not left optional with them, but was an absolute binding obligation to make deliveries to the best of their ability at the time specified in

the agreement unless they were prevented from making such deliveries by causes for which the plaintiffs were not responsible and over which they had no control." (p. 428.)

The language heretofore quoted from the contract in question does not give the appellant an absolute right to discontinue shipping cement whenever they desire to do so. The obligation is upon them to continue to ship cement under the contract until the entire amount has been furnished or until a contingency arises beyond its control, which prevents it from doing so, and then it is only excused from performing to the extent that the *pro rata* share of appellees would not be as great as the entire amount called for in the contract.

Appellees urge that from the terms of the contract the courts cannot determine the amount of cement to be prorated, and that the amount is left to the determination of the cement company, and this determination binds courts and parties. Should such a situation be sufficient to render a contract unenforceable it would never be possible to enter into a proration contract. The rule is that the proration clause does not come into operation until a contingency has arisen from some cause beyond the control of the seller that makes it necessary to exercise the right to prorate. And as we have seen from the cases cited, this right must be exercised in a reasonable manner, and not arbitrarily or dishonestly. The manner in which the contract would operate is that, in the event some contingency should arise that would render the cement company unable to fulfill the contract, then it would calculate the amount of cement due appellees, taking into consideration the amount on hand, and the amount due other customers, and ship that amount. The cause of this inability to perform would have to be some circumstance beyond the control of the company, and the amount shipped under the proration agreement would have to be fairly, honestly and reasonably calculated. All these things are the proper field of inquiry for courts and juries. A contract of this kind was upheld in this state in the case of *Mercantile Company v. Canning Co.*, 111 Kan. 68, 206 Pac. 237. A similar contract was a subject of litigation in *Jessup & Moore Paper Co. v. Piper et al.*, 133 Fed. 108, where the court held:

"Defendants, who owned a colliery reached by a single line of railroad, contracted to deliver at the works of plaintiff, at an agreed price, a stipulated quantity of coal each month during a series of months; the contract providing, however, that they should not be liable for a failure to perform

if prevented by hindrances beyond their control. During certain months they delivered less than the required quantity, as claimed, through their inability to obtain sufficient cars. *Held,* that they were excused from full performance if they were unable to obtain cars to enable them to fulfill all their contracts, and they in good faith made deliveries to all customers ratably, but that they were bound to put forth all reasonable and proper exertion, and to pay any reasonable additional expense to obtain cars, and were liable for non-performance if they failed to do so, or if they made the shortage of cars an excuse to demand an increased price, and gave a preference to such customers as paid it, and that if, after knowledge of the shortage of cars, they made additional contracts which lessened their ability to ship to plaintiff, they would be liable to that extent." (Syl.)

Also, in *Consolidated Coal Co. v. Peninsular Portland Cement Co.,* 272 Fed. 625, which case quotes from *Metropolitan Coal Co. v. Billings,* 202 Mass. 457, 89 N. E. 117, as follows:

"If it [plaintiff] had delivered to the defendant his proportion of existing and available supplies, then it was excused by the strike from any further performance of the contract. If it had not delivered to the defendant his due proportion, then to the extent to which the defendant had been damaged by such failure it was liable and the defendant could recover." (p. 462.)

There is nothing about the contracts in the above cases that render them any more readily subject to the inquiry of courts and juries than the contract in the case at bar.

We conclude, therefore, that there was no lack of mutuality in the contract in the case in question, and that the demurrer should not have been sustained. The judgment is reversed with directions to proceed.