Argued February 5, affirmed February 23, rehearing denied March 16, 1915.

# BYRON *v*. FIRST NAT. BANK.

### (146 Pac. 516.)

**Banks and Banking—National Banks—Ultra Vires Acts—Acting as Loan Broker.**

1. A national bank cannot act as broker in lending its depositors' money to third persons.

**Contracts—Ambiguous Contracts—Construction in Favor of Promisee.**

2. Where a contract is reasonably susceptible of several constructions, that will be given it which is most favorable to the promisee; the court considering the circumstances of the contract to determine how the promisee understood it.

**Banks and Banking—National Banks—Action of President in Borrowing Money—Sufficiency of Evidence.**

3. Evidence held sufficient to show that the president of defendant bank, in borrowing plaintiff's money, acted for the bank and not for himself.

**Banks and Banking—National Banks—Power to Borrow—Necessity for Emergency.**

4. It is within the power of a national bank to borrow money, though there is no emergency.

**Banks and Banking—National Banks—Actual and Implied Authority of President to Borrow—Authority Through Estoppel.**

5. The president of a national bank has no authority by his position to borrow money for the bank, but the creditor may still hold the bank on such a transaction on the ground of estoppel *in pais*.

**Banks and Banking—National Banks—Authority of President to Borrow for Bank—Facts Showing Estoppel.**

6. Where the president of a national bank managed its affairs, and drew checks on the plaintiff's funds, claimed by her to have been lent to the bank, signing her name without any question from the bank as to his authority, which must have had notice through other officials during the continuance of the transactions for two years, the bank was estopped to deny that the loan of money, alleged to have been to the president personally, was not to him acting for it.

**Banks and Banking—National Banks—Suit for Money Lent to—Account Stated as Defense.**

7. A statement, rendered a depositor by a national bank which had been borrowing money from her, that merely showed the amounts checked out of her account, and casually credited certain notes, but did not purport to be a full statement of her dealings with the bank, could not be pleaded as an account stated by the bank.

From Douglas: Thomas J. Cleeton, Judge.

Department 1.   Statement by Mr. Justice McBride.

This is an action by Elizabeth Byron against the First National Bank of Roseburg, a corporation, to recover certain sums of money which plaintiff claimed to have loaned to the defendant bank.  The complaint alleges, in substance, that between about the 6th day of February, 1905, and about the 17th day of June, 1911, the said plaintiff was a customer and patron of the said defendant bank, and during said time deposited large sums of money with said bank, and from time to time checked out portions of the same; that during said time it was understood by and between the plaintiff and defendant that the defendant might use and borrow from the plaintiff of said moneys to her credit as a depositor in said bank such sums and at such times as might be desired by the said defendant, and to pay plaintiff interest thereon; that between said dates the said defendant borrowed from plaintiff from said amounts to the credit of the said plaintiff at various times and in various amounts, and at various times and in various amounts repaid a portion of the same by depositing moneys and credits to the credit of plaintiff in its said bank, and thereby repaid all of said sums so borrowed, excepting an aggregate amount of $3,254.25, which said balance of $3,254.25, together with $959.83 interest, is due and owing from defendant to plaintiff on account of said transactions.

The answer alleged that at the dates set out in the complaint plaintiff was a customer and patron of the bank and from time to time deposited and checked out large sums of money from the same, and made general denial of all the other allegations of the complaint; containing this further affirmative defense:

''For a further separate, and affirmative defense to plaintiff's cause of action, defendant alleges that on

or about the 17th day of June, 1911, the defendant rendered and delivered to the plaintiff a true and correct statement of her account with the defendant, showing that all the moneys deposited with the defendant by the plaintiff had been withdrawn by her and her account had been balanced; that said account so rendered and stated to the plaintiff by the defendant was acquiesced in and approved by the plaintiff, and the plaintiff never made any objection to the defendant to said account as so stated to the defendant.''

The new matter in the answer having been put in issue by the reply, a trial was had, and a verdict for plaintiff was rendered by the jury for the sum of $3,254.25. From a judgment upon this verdict, defendant appeals.     AFFIRMED.     REHEARING DENIED.

For appellant there was a brief and an oral argument by *Mr. Oliver P. Coshow.*

For respondent there was a brief and an oral argument by *Mr. Albert Abraham.*

MR. JUSTICE McBRIDE delivered the opinion of the court.

The fact that plaintiff deposited $3,254.25 more in the defendant bank than she herself checked out is clear. The only question arising on this branch of the case is whether she authorized T. R. Sheridan individually to check out the money and lend or use it for himself, or whether she contracted to lend it to the bank. The evidence discloses the fact that Sheridan was president of the bank and active in its management; that when plaintiff transacted business with it she usually transacted it with Sheridan if he was present, but with the other employees in his absence. The plaintiff, a woman past 60 years of age, had by

inheritance from her husband recently become the
owner of a deposit made by him in the defendant bank,
which amounted in all to about $3,000.   Shortly after
her husband's death she went to the bank to make a
further deposit, when she had a conversation with
Sheridan, which it is claimed constitutes the contract
sued upon.    The whole conversation was as follows:

"Just when I was leaving there [referring to the
bank], T. R. Sheridan said, 'Mrs. Byron, you have
got too much money in the bank to be laying idle,' and
I says: 'What will I do with it?   If I loan it, I will
lose it.'   And he says, 'I will keep it working and give
you 7 per cent and keep 1 per cent for the bank.'
Those are just the words that he said. * * That was
all that was said.   That was all the bargain that was
made. * * I said, 'All right, for if I loan it I will lose
it.'   He was president of the bank and doing business
for the bank, I suppose.''

Later the following question was asked, and the an-
swer was permitted over defendant's objection and
exception:

"Q. Who was you dealing with, the bank or with
him?
"A. The bank; he was president of the bank. * *
Mr. Sheridan was president of the bank, and when I
wanted money I went to the bank and got it."

1–3. Putting aside for the present the question of
the authority of the president to borrow money on be-
half of the bank, we will determine whether this testi-
mony was sufficient to justify the jury in finding that
the contract was made on its behalf, or whether it
merely discloses a contract between plaintiff and Sher-
idan individually to act as a broker for plaintiff in
lending her money to third persons.   It may be con-
ceded, and it is the law, that a national bank cannot act
as a broker; so, if the contract is to be construed in

that aspect, plaintiff's case must fail. It is either a loan to the bank or a private transaction with Sheridan. It is a rule of law that, where a contract is reasonably susceptible of several constructions, that must be taken which is most favorable to the promisee: *Hoffman* v. *Aetna Ins. Co.*, 32 N. Y. 413 (88 Am. Dec. 337) ; *Moore* v. *Aetna Ins. Co.*, 75 Or. 47 (146 Pac. 151). From the authorities cited in the foregoing cases, we also derive the rule that in such instances the court will consider the relations of the contracting parties with a view of determining how the promisee must reasonably have understood the contract. In this case we find, on the one hand, a woman evidently unaccustomed to business and evidently so distrustful of her own capacities as to be afraid to lend her money. She is in a bank, displaying, no doubt, the usual evidences of wealth and solidity calculated to impress her with confidence that in its hands her little hoard would be entirely safe. That she had such confidence is shown by the fact that she had allowed her money derived from her husband to remain there, and for the second time since her husband's death had that day made an additional deposit of a considerable amount. She feared to trust individuals, but to her the First National Bank of Roseburg was the emblem of solidity, and, when the president of that institution advised that her money ought not to lie idle, but that he would keep it working and give her 7 per cent, and take 1 per cent out for the bank, she no doubt thought that he was speaking for the bank, and that it was the responsible party. There is no testimony to indicate that she had ever at any time had any business relations with Sheridan personally, or even any acquaintance with him, except that derived from her transacting business at the bank, and under the circumstances, it is reasonable to infer that she supposed

the bank would take her money and use it for its own purposes.  She was in the bank talking to the president, who was bargaining to make 1 per cent out of the money for the benefit of the bank, and she no doubt thought she was lending the money to the bank, and that its intention was to relend it at a higher rate of interest.  Her intent in the matter was to lend her money to a safe debtor.  Perhaps, her idea as to how the bank would make any profit on such a transaction may have been a little hazy, and a man accustomed to business would have hesitated to enter into the transaction without further inquiry; but there is enough here to authorize a jury to infer that she thought she was lending the money to the bank and that Sheridan intended she should think so.  That he intended she should still have this impression is shown by the statement furnished her in May, 1906, when she asked for a statement of the interest that had accrued, and received the following:

"First National Bank.   No. 4624.   Roseburg, Oregon, May 5, 1906.   We credit Mrs. John Byron on $3,000, as interest, $210.   T. R. Sheridan."

The late Roscoe Conkling once remarked that only three classes of persons were privileged to use the pronoun "we" in reference to themselves individually, namely, "editors, emperors, and men, with tapeworms"; and it is common experience that nobody uses the plural pronoun when writing in regard to business pertaining to himself as an individual.  The "we" was calculated to, and no doubt did, convey the impression to Mrs. Byron that the statement furnished was that of the corporation, and not of Sheridan personally.  Having arrived at the conclusion that there was evidence sufficient to go to the jury that Sheridan actually

made the contract on behalf of the bank, and that the loan was to the bank and not to him personally, the next question confronting us relates to his authority to bind the bank by such a contract.

4. The power of a national bank to borrow money except in emergencies was seriously questioned in some of the early cases, as may be seen from the authorities cited. Magee on Banks and Banking, page 351, contains an exhaustive discussion of the subject; but the later authorities seem to indicate the general adoption of a broader rule: 1 Michie on Banks and Banking, § 97, and authorities there cited. We conclude that the contract in question was one which it was in the power of the bank to make.

5-7. A more serious question is that of the authority of Sheridan to make it. It seems to be a general, though not universal, rule that the president of a bank as such does not possess power to borrow money without express or implied authority from the board of directors, and there are cases in which the lender has been denied a recovery where large sums have been loaned upon the solicitation of the president of the debtor bank without this authority having been conferred upon him: *Western National Bank* v. *Armstrong,* 152 U. S. 346 (38 L. Ed. 470, 14 Sup. Ct. Rep. 572). But while the president may not have such technical authorization as empowers him in the first instance to secure the loan, it does not follow in all such cases that the creditor must lose his money. The bank may actively or passively conduct itself with reference to such a transaction as to be estopped from asserting that the transaction was beyond the power of the particular officer to enter into, and by its negligence and lack of supervision place itself in, a position where to allow it to avoid the transaction would be to

permit it to perpetrate a fraud upon the creditor: *Aldrich* v. *Chemical National Bank,* 176 U. S. 618 (44 L. Ed. 611, 20 Sup. Ct. Rep. 498); *Wyman* v. *Wallace,* 201 U. S. 230 (26 Sup. Ct. Rep. 495, 50 L. Ed. 738); *Poppleton* v. *Wallace,* 201 U. S. 245 (50 L. Ed. 743, 26 Sup. Ct. Rep. 498); *U. S. National Bank* v. *First National Bank,* 79 Fed. 296 (24 C. C. A. 597); *Merchants' Bank* v. *State Bank,* 10 Wall. 604 (19 L. Ed. 1008). While none of the authorities above stated are parallel in all their features with the case at bar, we may fairly deduce from them the general rule above stated. In the instant case, the testimony tends to show that Sheridan was practically the manager of the bank and prominent in its affairs; that he was permitted to check out from the moneys sued for here, signing Mrs. Byron's name to memorandum checks without any question as to his authority to do so, and without any written authority. It is fair to assume that no person outside of the circle of bank officials would have been allowed to check out a single dollar without some demand being made upon him for authority from his principal for so doing. This he was permitted to do evidently because of his position, and this custom extended over a period of more than two years and could not have escaped the notice of other officials of the institution if they had been at all attentive to their duties. The presumption is that they did know, and, if they knew, they must have acquiesced. It is a significant fact that Sheridan was in the vicinity at or near the time of this trial and was not called by the defendant to explain this transaction by which, under color of his office as its president, a large proportion of plaintiff's savings had been drawn out; for what purpose or for whose benefit does not clearly appear. The plea of an account stated cannot prevail. It does

not purport to be a full statement of all transactions between her and the bank, but is merely a writing or summary of her deposit account showing what sums had been drawn out. Under her contract with the bank, she, no doubt, expected Sheridan or some other official to draw out the money, and the casual credit of certain notes in the account is too equivocal to charge her with notice that the money was being loaned on her account. From the whole case it appears that the defendant through its president decoyed an ignorant old woman, who relied upon the credit of the bank, into making an equivocal contract, whereby she must probably lose her money unless the defendant pays it, as in good morals it ought to do. Under such circumstances, courts will not be astute to search for technical reasons to enable the defendant to escape from the consequences of a contract made for it by its chief officer.

The judgment is affirmed.

AFFIRMED. REHEARING DENIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE BENSON concur.