### AMERICAN FUEL CO. v. INTERSTATE FUEL AGENCY.

(Circuit Court of Appeals, Ninth Circuit. October 27, 1919.)

#### No. 3352.

1. CONTRACTS ⬷155—CONSTRUCTION AGAINST PARTY USING WORDS.

A provision inserted in a contract with a view to protect one of the parties thereto is to be construed against him, if ambiguous.

2. SALES ⬷87(6)—AMOUNT OF MONTHLY DELIVERIES UNDER CONTRACT TO DELIVER COAL.

A provision of a contract by a mining company to deliver 15,000 tons of coal within one year as ordered, that the company should use diligence to fill orders, but should "not be obligated to ship during any month in excess of 2,500 tons," and that the contract should terminate whenever 15,000 tons had been furnished, *held* to entitle the purchaser to demand delivery of 2,500 tons a month until the contract was filled.

3. SALES ⬷176(1)—DELAY IN DELIVERY NOT WAIVED BY PERMISSION TO CATCH UP BACK SHIPMENTS.

Under a contract to deliver 15,000 tons of coal at the rate of at least 2,500 a month, where seller had failed to so deliver during certain months, a ,letter of the buyer giving seller permission to "catch up" all back shipments by shipping mine run coal was not a waiver of damages theretofore sustained from seller's failure to deliver coal on time; the permission to "catch up" merely extending a privilege without consideration, and revocable at the buyer's pleasure.

4. TRIAL ⬷260(9)—INSTRUCTIONS; REFUSAL OF REQUESTS COVERED.

In an action for breach by a mining company of a contract to deliver coal, refusal of instructions requested by defendant *held* not error, in view of the instructions given.

---

⬷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by the Interstate Fuel Agency against the American Fuel Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The Interstate Fuel Agency recovered a verdict and judgment against the American Fuel Company. The fuel company sued out a writ of error. The action was for breach of a contract by plaintiff below, the Interstate Fuel Agency, a Washington corporation, against the American Fuel Company,-a Utah corporation, doing business in the state of Washington. The contract was made April 25, 1917, between the American Fuel Company, called the shippers, and the Interstate Fuel Agency, called the jobbers. The agreement, after reciting that the shippers are engaged in mining and selling coal, and that the jobbers are desirous of purchasing from the shippers 15,000 tons of coal for resale, provides as follows: "(1) The shippers hereby agree to sell and deliver f. o. b. cars, at Neslen, Utah, to the jobbers, and the jobbers hereby agree to buy, accept, and pay for 15,000 tons of coal from shippers' mine, within one year from April 25, 1917, consisting of lump, egg lump, and stove coal, upon the following terms and conditions." The sole right to sell coal in certain parts of Idaho, all of Washington, and a portion of Oregon, subject to existing rights of six certain named corporations and partnerships under contract, was in the jobbers. It was also agreed that the jobbers would either procure the cancellation of said contracts, or "out of said 15,000 tons would supply the demands" of the firms and corporations named, and that the shippers were to have credit on the 15,000 tons for any coal shipped by them to the firms and corporations under contracts referred to. Paragraph C provides that for any sales of coal by the shippers during the existence of the contract in the territory named the jobbers should be credited by the shippers with the difference between the contract price, as specified in the agreement, and the price for which the coal was sold, the tonnage of coal so sold and delivered to be charged against the 15,000 tons to be sold the jobbers. The prices to be paid are specified. It was also agreed that the jobbers should from time to time on and after April 25, 1917, give the shippers orders for the shipment of said coal; that the shippers would use diligence to fill the orders, but should not be obligated to ship during any month in excess of 2,500 tons; that the contract should terminate whenever 15,000 tons had been furnished to the jobbers, including all coal thereafter furnished by the shippers under said contract with any or all of the six firms or corporations previously named in the agreement, and including also any coal sold and delivered by the shippers in the territory described in the agreement. The shippers were not to be responsible in case of shortage of cars for shipment, and in furnishing coal the jobbers should have the right only to their just and equitable proportion of cars available for filling all of shippers' orders. The shippers were to be relieved from immediate performance of the contract and liability thereunder, if by reason of war or government control, labor troubles, strikes, acts of God, or other causes beyond their control, they were prevented from operating their coal mines or disposing of the product thereof. Each shipment was to be paid for by sight draft drawn by the shippers on the jobbers at Spokane, Wash., with railroad bill of lading attached. If any of the drafts remained unpaid for more than 10 days after arrival of coal shipment at final destination, then at the option of the shippers the agreement could be terminated.

Ratification of the contract by the shippers is pleaded. It is alleged that after the agreement was made the Interstate Fuel Agency placed an order with the fuel company for shipment at the rate of 2,500 tons per month, alleged to be the maximum which plaintiff was entitled to demand under the contract, and the minimum which the defendant could ship without violating the agreement, but that only 3,318 tons were shipped up to the time of the commencement of this action, and that since October 16, 1917, the fuel company had failed to ship any coal under the contract; that the jobbers procured the can-

cellation of all the six outside contracts mentioned in the agreement, except the contract with the International Fuel Company at Spokane, and had notified the defendant of the cancellation of such contracts, and that under its order of 2,500 tons per month the tonnage to which the jobbers were entitled under the agreement should have been wholly shipped and received not later than October 31, 1917, but that there was a failure to perform. It is alleged that the jobbers did all the things required to be performed by them, and that under the agreement there remained due to the jobbers 11,613 tons; that at the time of the breach the market value of the coal was $2.55 per ton higher than the contract price, and that damages were suffered on that basis in the amount of 11,613 tons, or $29,614.52.

The shippers admitted the contract, denied shipment of only 3,318 tons, denied ratification and damage, and set up that under the contract for furnishing coal to the International Fuel Company at Spokane, one of the six outside companies named in the agreement, from the 16th day of March, 1917, to the 1st day of May, 1918, the shippers obligated themselves to furnish coal during the life of the contract to 5,000 tons; that between April 25, 1917, and April 25, 1918, it furnished 4,906 tons to the International Fuel Company, and prior to April 25, 1917, the shippers had not furnished any coal under said contract; that, after the contract was made between the American Fuel Company and the Interstate Fuel Agency, the American Fuel Company was under contract so to furnish coal to the International Fuel Company, and the amount to be furnished to the International Fuel Company was a first charge or claim against the entire total of 15,000 tons mentioned in the contract between the fuel agency and the fuel company. It is also alleged that under a contract between the fuel company and the Madison Fuel Company, another outside company, referred to in the agreement between the parties to this litigation, the fuel company subsequent to April 25, 1917, and prior to April 25, 1918, furnished 49 tons to the Madison Fuel Company, which should be credited upon the contract with the jobbers; that fuel was also furnished to others mentioned in the contract between the parties hereto to the amount of 15,000 tons and over. The shipping company also says that prior to April 25, 1918, it furnished 10,188 tons under the contract, all of which was accepted, except 2,711 tons furnished after March 18, 1918.

For a further defense it was pleaded that, war between the United States and Germany having been declared on April 6, 1917, railroad traffic became congested, and cars could not be obtained, except in limited numbers, and that by reason of the situation the fuel company could not furnish 2,500 tons of coal per month prior to February, 1918, or any more rapidly than it did furnish coal, "by giving plaintiff a just and equitable proportion of cars available for filling all of the shippers' orders which defendant had for filling"; that its mines were situated in Utah, and that prior to October, 1917, the United States government took charge of the fuel distribution, and defendant was ordered to cease shipping coal to any of the districts embraced in the contract between plaintiff and defendant, and that the shipping company could not furnish under the contract with the jobbers at the rate of 2,500 tons a month having regard for the rights of others. It is set up by way of counterclaim that the shipping company, between March 8, 1918, and March 22, 1918, shipped 52 cars, amounting to 2,711 tons, as provided by the contract, and drew drafts for shipments, but that the fuel agency refused to pay the drafts or to accept the coal, and that demurrage accrued, and the shipping company was obliged to sell 50 cars of coal at a loss, and also lost by reason of expenses. A counterclaim for $1,276 damages was made.

To this answer the jobbers filed a replication, and, after denying the material averments in the answer, set up that prior to the beginning of this action the shippers under the contract furnished, within a period of 37 weeks after the execution of the contract, 89 cars of coal, and that when the coal was in great demand the shippers failed to ship any coal whatever, and that in February, 1918, the shippers shipped one carload and requested the jobbers to receive it; that they agreed to receive it without prejudice to the action then pending, and that the shippers continued to ship under like agreement, and against objections of the jobbers shipped 139 cars, to the loss and damage of the jobbers; that the jobbers disposed of 84 cars at best obtainable prices,

but could not dispose of all that was sent prior to March 22, 1918. The jobbing company again set up that under its contract it was entitled to the full amount of 15,000 tons, and that if its order, which was placed about May 1, 1917, had been complied with, the tonnage would have been completed long prior to the beginning of this action.

The jury found generally for the jobbers in the sum of $9,272.

Dey, Hoppaugh & Fabian, of Salt Lake City, Utah, and James A. Williams and Danson, Williams & Danson, all of Spokane, Wash., for plaintiff in error.

A. O. Colburn and Del Cary Smith, both of Spokane, Wash., for defendant in error.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The principal assignments of error are based upon the refusal of the court to give instructions adopting a construction of the contract in accord with the contentions of the shippers. The more important points are involved in the following discussion:

[1, 2] It is argued by the shipping company that the provision in the contract concerning the 2,500 tons per month to be delivered is for the purpose of protecting the shippers against being "swamped" with orders from the jobbers, and was not for the purpose of giving to the jobbers the right to any specific amount of coal. The pertinent clause is:

"The shippers will use diligence to fill said orders, but shall not be obligated to ship during any month in excess of 2,500 tons; that this contract shall end and terminate whenever 15,000 tons have been furnished."

Our understanding of this language is that, if the jobbers should order more than 2,500 tons per month, the shippers would use diligence to fill such order, but that there would be no obligation upon the shippers to ship more than 2,500 tons. The shippers were obligated to ship as much as 2,500 tons per month, if that amount were ordered by the jobbers. "Obligated" means bound to do; and the jobbing company proved to the satisfaction of the jury that 2,500 tons per month never were, but could have been, shipped. On principle, too, if the argument of the shippers is sound, and the provision concerning the 2,500 tons was inserted in the contract with a view to protect the shippers, then a construction should be adopted which would be against the shipper, if the contract is ambiguous in its terms. Page on Contracts, § 1122; Byron v. First Nat. Bank, 75 Or. 296, 146 Pac. 516; Metropolitan Building Co. v. Seattle, 92 Wash. 660, 159 Pac. 793.

[3] It is argued that the court erred in refusing to permit the shipping company during the trial to amend its answer, so as to allege specifically a waiver by the jobbing company of any alleged breach. The argument is that before the conclusion of the evidence certain letters written by the jobbing company to the shipping company were introduced, which tended to show that, if there had been any breach of the contract up to the time of the trial of the present suit, the jobbing company had waived the same. Stress is laid upon a letter by the jobbers, dated August 25, 1917, in which the jobbers stated that they un-

derstood the difficulties which the shipping company had encountered in meeting the requirements of the railroad for coal, and that the shipping company had the full permission of the jobbing company to "catch up" all back shipments by shipping mine run coal. The letter also states:

"How about sending a few cars right now to help catch up?"

The error of the shipping company lies, we think, in construing the contents of this letter as going to show a waiver of any damages which had theretofore been sustained by the jobbing company on account of the failure of the shipping company to deliver coal on time. Permission to "catch up" all back shipments by shipping mine run coal merely extended a privilege without consideration; the privilege being revocable at the pleasure of the jobbing company. In Phillips & Colby Construction Co. v. Seymour, 91 U. S. 646, 23 L. Ed. 341, the Supreme Court said:

"If the builder has done a large and valuable part of the work, but yet has failed to complete the whole, or any specific part, of the building or structure within the time limited by his covenant, the other party, when that time arrives, has the option of abandoning the contract for such failure, or of permitting the party in default to go on. If he abandons the contract and notifies the other party, the failing contractor cannot recover on the covenant, because he cannot make or prove the necessary allegation of performance on his own part. * * * But if the other party says to him, 'I prefer you should finish your work,' or should impliedly say so by standing by and permitting it to be done, then he so far waives absolute performance as to consent to be liable on his covenant for the contract price of the work when completed. For the injury done to him by the broken covenant of the other side, he may recover in a suit on the contract to perform within time; or, if he wait to be sued, he may recoup the damage thus sustained in reduction of the sum due by contract price for the completed work."

See Jessup & Moore·Paper Co. v. Piper (C. C.) 133 Fed. 108.

The question of allowing the amendment was discretionary, and we find no error in denying the request, especially considering that the shipping company based its defense on the ground that the contract had been performed in compliance with its terms and denied any breach.

[4] Error is assigned to the refusal of the court to give a requested instruction to the effect that the shipper was entitled to an allowance by way of credit for coal which it was obligated to deliver—not for that which it had delivered. The provision of the contract referring to coal shipped to outside firms was that the shippers should have credit "on said 15,000 tons for any coal shipped by them to said firms or corporations under said contracts." The language, "shipped" by them, makes a distinction between coal actually shipped and that which the shipping company was obligated to ship. This distinction was recognized by the learned District Judge when, in charging the jury, he stated that, if they were satisfied that the existing outside contract between the parties was one for 5,000 tons, then the shipping company would be entitled to a credit for the full amount delivered. The jury found, however, that the contract was not for 5,000 tons, as contended by the shipping company; wherefore any instructions based upon the

theory that the contract was for 5,000 tons became immaterial, and under no circumstances could they have operated to the prejudice of the shipping company.

It is next argued that the court erred in refusing certain requests for instructions with respect to the measure of damages. The argument is that in one of the affirmative defenses interposed by the shipping company it set up that after the beginning of the action, and before the expiration of the year within which the coal was to be furnished, the shipping company furnished certain coal under the contract to the jobbing company, which coal was received by the latter. We think that the coal transactions had between the shipping company and the jobbers in February and March of 1918 should not be considered as directly relating to the determination of the controversy, because it was expressly stated in a communication by the jobbers to the shippers that shipments made in February and March should be "accepted without prejudice to this action." While it is true that the jobbing company stated to the shipping company that they would only consent to the shipping company being credited in the suit "for any coal so shipped with any profit" made by the jobbing company thereon, it does not appear that the shipping company agreed to ship under such terms. Therefore there was no acceptance of the offer of the jobbing company. Nor did the shipping company plead what the profit was on the February and March shipments by way of lessening damages. It is, to be reiterated that the shipping company tried its case on the theory that it had performed its contract in full, and that there were no damages accruing to the jobbing company, and never agreed to ship under the offer and terms of the jobbers in February and March, 1918. We therefore affirm the ruling of the District Court that whatever rights the jobbing company had under the contract accrued within six months from delivery of the order for the shipment of coal early in May, because no order for a later shipment was given, and the shipper could claim no damages by reason of attempts to deliver coal in February and March of the succeeding year, because such attempt was made without an order of the jobbing company concerning such shipments or authorizing the same.

It is also said that the court erred in refusing certain requests embodying instructions to the effect that, if the shipping company was prevented by acts of God, labor trouble, or other causes beyond their control, from fulfilling the contract or operating its mines, such facts should be taken into consideration in determining whether there was a breach of the contract, and, if it was found that there was a breach for any such cause, allowance should be made for any time shippers were prevented from operating their mine or for the curtailment of the output of the mine. Stress is laid upon the point that the evidence showed that there was a washout on one of the railroads, and that shipments to the jobbers were prevented thereby, and that a shortage of cars resulted. The court, however, charged that, if it was found that due diligence was used by the shippers to fill the order, and the failure to deliver coal was caused by a shortage of cars, and that the shipping company made a just and equitable apportionment of cars

available, then the immediate performance of the contract was excused as a matter of law. We think this sufficiently covered the point.

The next assignments of error are based upon the refusal of the court to instruct the jury that, owing to war conditions, it was the duty of the shippers to comply with the orders of the President of the United States, and that, if by reason of any order of the President the ability of the shipping company to perform its contract with the jobbers was curtailed, allowance should be made for such conditions in determining whether the shipping company was liable to the jobbing company, and the extent of the liability. The court charged that there was no evidence that any orders were made by the National Fuel Administration which prevented the defendant from performing its contract during the life of the order given by the jobbing company, which expired early in November, 1917, and that therefore the jury need not deliberate upon such a defense. The order of the Fuel Administrator, dated August 23, 1917, however, expressly provided that—

"Contracts relating to bituminous coal made before the proclamation of the President on August 21st are not affected by these proclamations, provided the contracts are bona fide in character and are enforceable at law."

Under such evidence it was the duty of the court to instruct as it did concerning the failure to prove that there were any orders made by the agents of the government which would prevent the fulfillment of the contract.

The shippers requested certain instructions concerning the responsibility in case of a shortage of cars and interference with the performance of the contract because of such shortage. The shippers argue that the clause in the contract which provides that in furnishing coal the jobbers shall have the right only to their just and equitable proportion of cars available for filling all of shippers' orders, the jobbers were only entitled to receive on any orders placed by them a just and equitable proportion of all cars available for all orders which the shippers had for the furnishing of coal, whether such orders were given by the jobbers or by other customers. The District Court instructed that, in case of inability to obtain cars for the shipment of the product of its mine, the shipping company, after exercising due diligence on its part, might apportion the cars available pro rata among the different jobbers who held contracts or orders for the delivery and shipment of coal, provided the contracts outstanding and the orders taken did not exceed the amount of coal available for shipment and delivery at the time. We believe that to be a plain and comprehensive statement of the true meaning of the portion of contract relating to distribution of cars and adequately covered the point involved. Jessup & Moore Paper Co. v. Piper, supra; Garfield & Proctor Coal Co. v. Penn. Coal Co., 199 Mass. 22, 84 N. E. 1020.

The shippers urge that the court erred in refusing certain requests for instructions that under the contract the jobbing company was entitled to a full year from April 25, 1917, within which to receive and pay for the coal, and that the shipping company was entitled to a full year from said date within which to ship the coal. The contention of the shipping company is that under the contract the jobbing company had

no right to insist upon 2,500 tons being shipped for any number of consecutive months, and that there was no obligation on the shipping company to ship the coal within a period of less than one year. But under the contract there was the obligation to ship 2,500 tons when the order of the jobbers for that amount was entered by the shipping company; hence it follows that the construction adopted by the District Court was correct, and therefore that the requested instructions were properly refused.

It is contended that the court, in stating the issues and the contracts with an outside company (the International Fuel Company), erred in charging the jury that the jobbers contended there was a contract for the sale of 3,000 tons of coal, expiring on May 1, 1917, while the shippers contended that the contract was superseded by another contract and canceled, and that there was a modification to provide for the sale and delivery of 5,000 tons of coal, and in advising the jury that it was for them to say from the evidence which of the contracts was in effect at the time of the execution of the contract in suit. The shippers say there was no evidence to authorize the submission of this matter to the jury. The record does not sustain the contention of the shippers, inasmuch as the president of the jobbers testified to a conversation which he had had with the president of the shipping company before the 15,000-ton contract was executed, wherein the 3,000-ton contract with the International Company was referred to and understood to be effective. Whatever issue arose in respect to the existence of any such contract became one of fact, and for the consideration of the jury.

We have given careful consideration to all of the assignments elaborated in the brief of the counsel for the shippers, and find no ground for a reversal of the judgment. While it does not appear exactly how the jury arrived at their verdict of $9,272 damages in favor of the jobbers, every reasonable presumption is that they fairly considered the evidence in behalf of the defenses interposed, and applied the law as given by the court. The record, including statements showing the amount of coal shipped and sold on the open market, sustains the contention that the shipping company could have shipped the requisite amount of coal to the jobbers, but failed to do so because the profit per ton was greater upon sales in the open market than it would have been had they complied with their contract.

The judgment is affirmed.